IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 28, 2010

**STATE OF TENNESSEE v. ORVILLE LOSEY**

**Appeal from the Coffee County Circuit Court**
**No. 36665     William C. Lee, Judge**

**No. M2009-02358-CCA-R3-CD - Filed January 7, 2011**

The Defendant, Orville Losey, was found guilty by a Coffee County Circuit Court jury of three counts of aggravated assault, a Class C felony. See T.C.A. § 39-13-102 (2006) (amended 2009, 2010). He pled guilty to resisting arrest with a weapon, a Class A misdemeanor. See T.C.A. § 39-16-602 (2010). He was sentenced as a Range II, multiple offender to eight and one-half years' confinement for each of the aggravated assault convictions and to eleven months, twenty-nine days' confinement for the resisting arrest conviction, to be served concurrently. On appeal, he contends that (1) the evidence was insufficient to support his convictions and (2) his sentences are excessive and not consistent with the purposes and principles of the Sentencing Reform Act. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Robert T. Carter, Tullahoma, Tennessee, for the appellant, Orville Losey.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Mickey Layne, District Attorney General; and Wesley Hunter Southerland, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to an altercation between the Defendant and three police officers after they arrived at the scene of a domestic disturbance. Tullahoma Police Officer Johnny Gore testified that he responded to 703 Bragg Circle after the police received a call reporting that the Defendant was arguing with his mother and "ransacking" her house. He said that the

Defendant was standing in the driveway when he and Officer Roger Sanson arrived and that the Defendant ran into the house after seeing them. He said he and Officer Sanson followed the Defendant to the back door and entered the home after hearing loud arguing and yelling inside. He said they walked into the kitchen and encountered the Defendant, who swung at Officer Sanson with a buck knife. He said that the Defendant was about three feet away and that Officer Sanson jumped back when the Defendant swung the knife. He said the Defendant yelled that he was going to "cut [their] hearts out" and kill them. He said the Defendant repeatedly told them that he was not afraid to die and asked them if they were ready to die. He said that although he shot the Defendant with a taser, the Defendant was able to remove the taser probes and run outside.

Officer Gore testified that they followed the Defendant into the front yard and that the Defendant's mother, Jolene Crader, stood on the front porch. He said that Officer Jim Tate arrived and that the three officers attempted to restrain the Defendant. He said he and Officer Sanson pointed their guns at the Defendant, who continued to wave his knife and ask them if they were ready to die. He said Officer Sanson hit the Defendant's hand and leg with a baton in an attempt to dislodge the knife. He said that the Defendant did not drop the knife and that Officer Sanson retrieved a taser from his police car. He said the Defendant continued to wave his knife at the officers and stated that he would cut out their hearts. He said Officer Sanson shot the Defendant twice with a taser, causing the Defendant to fall to one knee and drop the knife. He said the Defendant grabbed the knife and stood up before they could reach him. He said the Defendant held the knife by the blade and raised it behind his head as if to throw it at the officers. Officer Gore said this made him fear for his safety because his bulletproof vest was not designed to stop knives. He said that the Defendant began to speak with Officer Tate and that the Defendant eventually threw the knife to the ground.

Officer Gore testified that they rushed toward the Defendant when he dropped the knife. He said the Defendant "stiff arm[ed]" Officer Sanson underneath the neck before being wrestled to the ground. He said they held the Defendant's left arm behind his back and attempted to gain control of his right arm. He said the Defendant resisted each attempt by "ram[ming]" his arm underneath his body. He said the officers had to use force to take the Defendant into custody.

Officer Gore testified that the police did not have a video recording of the incident. He said the video recorders in police cars are turned on when officers activate the emergency lights. He said it was not normal procedure to activate the emergency lights when responding to a domestic disturbance between a mother and son. He said he and the other officers did not have time to return to their police cars and activate the video recorders after encountering the Defendant.

Officer Gore testified that the Defendant came to the police department a few days after he was arrested. He said the Defendant apologized for his actions and left.

On cross-examination, Officer Gore agreed that he had encountered many intoxicated and violent persons during his fifteen-year career as a police officer. He agreed that he underwent eight weeks of training before becoming a police officer and that he learned how to take intoxicated and belligerent persons into custody. He agreed that this was not his first time testifying in court and that he discussed the Defendant's arrest with Officer Tate and Officer Sanson before testifying.

Officer Gore agreed that he knew the Defendant and Ms. Crader. He said that Ms. Crader filed a complaint against him but that he could not remember if she filed it before or after the Defendant's arrest. He said that he saw the Defendant standing in the driveway when he arrived at Ms. Crader's home and that he did not see Ms. Crader until he chased the Defendant into the front yard. He said he saw the Defendant's brother, Jason Crader, standing on the front porch after the Defendant was in custody. He agreed that none of the police cars had their lights or video recorders turned on. He agreed that he wore a loaded police revolver, that he was trained to use his gun, and that he could have shot the Defendant.

Officer Gore testified that he shot the Defendant with his taser after the Defendant swung at Officer Sanson with a knife. He said the Defendant stood about five feet from him when he used the taser. He said the Defendant staggered, backed into the hallway of the home, and ran outside. He disagreed that the Defendant constantly retreated from the officers. He said that the Defendant moved toward the officers during the confrontation in the front yard and that Officer Sanson pushed the Defendant away using his baton. He said the Defendant stopped several times to wave the knife at them. He said the Defendant was about ten feet away from the officers as he waved the knife. He agreed the Defendant could not reach the officers when he waved the knife but said the Defendant was close enough to throw the knife at them. He said the police discovered two additional knives on the Defendant after his arrest. He disagreed that the Defendant offered his hands to the officers when he was arrested. He agreed that the Defendant apologized to him a few days after the arrest but denied telling the Defendant not to worry about it.

Officer Gore testified that he was trained to prepare warrants and agreed that all significant facts relating to an arrest should be noted on an arrest warrant. He said Officer Tate prepared the Defendant's arrest warrant. He agreed the warrant did not state that the Defendant swiped the knife at officers in the kitchen but stated that officers "had a confrontation with [the] subject and had to tase [the] subject." He agreed the warrant did not state that the Defendant raised the knife in an attempt to throw it, but he said the event was noted in the arrest report. He agreed the warrant stated that when the police arrived, the

-3-

Defendant was in the backyard arguing with his mother. He said that although he could hear an argument between a male and female when he arrived, he could only see the Defendant. He agreed the warrant did not state that the Defendant grabbed Officer Sanson's neck.

On redirect examination, Officer Gore testified that he had prepared several warrants during his career. He said that the procedure involves the officer describing the events to a judicial commissioner, who writes the information needed to establish probable cause on the warrant. He said the description of events written on warrants was normally brief and would not contain all of the information the officer told the judicial commissioner. He acknowledged his sworn testimony at a preliminary hearing about a month after the Defendant's arrest in which he stated that the Defendant swung the knife at Officer Sanson in the kitchen and that he shot the Defendant with a taser.

Officer Gore testified that although he had encountered many intoxicated and belligerent persons, he rarely encountered persons as intoxicated and belligerent as the Defendant. He said the Defendant had red eyes and veins "popping out of his neck." He said the Defendant told them he was ready to die and asked the officers if they were ready to die.

On recross-examination, Officer Gore testified that Officer Tate prepared the warrant and arrest report shortly after arresting the Defendant. He said judicial commissioners often paraphrase information when writing an arrest warrant. He did not know if the arrest report stated the Defendant swung a knife at Officer Sanson or grabbed his neck.

Tullahoma Police Officer Roger Sanson testified that he was dispatched to 703 Bragg Circle to respond to a son "ransacking" his mother's home. He said that he knew the Defendant and that the Defendant had not caused him any trouble before this incident. He said that when he arrived, he did not immediately recognize the Defendant but that Officer Gore did. He said that the Defendant went into the home and that he followed after he heard yelling inside the home. He said that although he did not remember seeing Ms. Crader in the home, he heard a female voice. He said the Defendant was "very irate" and told them he was going to cut off their heads, cut out their hearts, and asked if they were ready to die. He said that he walked toward the Defendant and that the Defendant swiped at him with a knife. He said the knife had a wooden handle, a stainless steel blade, and was larger than a pocket knife. He said he was about three feet from the Defendant when the Defendant swung the knife. He said that he did not wear a bulletproof vest that day and that he feared the Defendant during the confrontation. He said Officer Gore shot the Defendant with a taser. He said the taser stunned the Defendant and caused him to move backward. He said that they followed the Defendant into the front yard and that they walked past Ms. Crader, who stood on the front porch.

-4-

Officer Sanson testified that although he attempted to speak with the Defendant in the front yard, the Defendant did not want to listen to him. He said he was the focus of the Defendant's anger. He said he tried to force the Defendant to drop the knife by hitting the Defendant's leg and hand with a baton. He said he also pressed the baton into the Defendant's chest to keep him away. He said the Defendant continued to tell the officers he would cut off their heads and cut out their hearts. He said the Defendant held the knife behind his head as if he were going to throw it. He said that he told the Defendant, "don't make me kill you" and that the Defendant lowered the knife. He said he retrieved a taser from his police car and shot the Defendant twice with it. He said the Defendant fell to one knee and dropped the knife but regained his footing and the knife before officers could get to him. He said the Defendant told them, "I like electricity, I'm a tough son of a b----." He said that the Defendant began to calm down while speaking with Officer Tate and that the Defendant eventually threw the knife to the ground. He said that they advanced on the Defendant and that although the Defendant stiff-armed him, the Defendant did not choke him. He said that they wrestled the Defendant to the ground and that they forcefully gained control of his arms. He said the Defendant apologized to him twice after the arrest.

On cross-examination, Officer Sanson testified that his encounter with the Defendant was not the first time he dealt with belligerent people or drew his gun. He said persons with knives intimidated him, despite his training and experience. He said he did not turn on the lights or camera in his police car during the confrontation with the Defendant. He said he did not prepare the warrants or arrest report. He said that if he had prepared them, they would have stated that the Defendant swung the knife at him in the kitchen instead of describing the incident as a "confrontation." He said that Officer Tate was not in the house to observe the Defendant swing at him with the knife and that he was not sure if he mentioned the incident to Officer Tate after they arrested the Defendant. He said he did not see the Defendant lunge at anyone in the front yard. He denied telling the Defendant, "Don't worry, this happens all the time" after the Defendant apologized. He agreed that he was afraid for his life and feared imminent bodily harm during the encounter with the Defendant. He agreed that the officers could have shot the Defendant but said that a bullet might not have immediately incapacitated the Defendant.

On redirect examination, Officer Sanson testified that Officer Tate was the primary officer assigned to respond to 703 Bragg Circle. He said the primary officer has the responsibility to complete all paperwork related to an arrest, including the warrant and arrest report. He said most warrants in Coffee County were only a few sentences long.

Tullahoma Police Officer Jim Tate testified that he was dispatched to 703 Bragg Circle to respond to a domestic disturbance involving a son "ransacking" his mother's home. He said that Officer Gore and Officer Sanson were already at the home when he arrived and

that he did not see the events that occurred in the house. He said that he heard shouting as he approached the front porch and that Ms. Crader walked out of the home and stated, "He's crazy . . . you're going to have to kill him." He said that the Defendant walked outside and that the officers followed with their guns drawn. He said the Defendant stated, "I'm not afraid to die . . . are you ready to die," and, "I'll cut your heart out, I'll cut your head off." He said that he knew the Defendant and that he had never seen the Defendant act the way he did that day. He said the Defendant was highly intoxicated. He said he was afraid that they would have to shoot the Defendant to end the confrontation.

Officer Tate testified that the Defendant held the knife by the handle and lunged at them. He said the Defendant also held the knife by the blade as if he were going to throw it. He said he was afraid the Defendant would stab him or one of the other officers. He said that Officer Sanson pressed his baton into the Defendant's chest to keep the Defendant away and that the Defendant's anger was focused on Officer Sanson. He said Officer Sanson retrieved a taser from his police car and shot the Defendant twice with it. He said the Defendant fell to one knee and dropped the knife, but quickly regained his footing and the knife. He said the Defendant told them, "I like electricity, I'm a tough son of a b----, you can't hurt me." He said he motioned for the other officers to take a step back and told the Defendant to get rid of the knife and that they would discuss the matter. He said that the Defendant threw the knife on the ground and that the officers wrestled the Defendant to the ground. He said he arrested the Defendant and found two knives in the Defendant's pockets. He said that he drove the Defendant to jail and that the Defendant told him that he was going to kill Officer Sanson. He said the Defendant came to the police station with his mother a few days after his arrest and apologized.

Officer Tate testified that there was not a video recording of the incident because he did not activate the lights or camera in his police car. He said he had no reason to record the incident because he believed he was responding to a routine confrontation between family members. He said he did not turn on the camera when the confrontation escalated because he was focused on protecting himself and the other officers. He said video recordings were normally made only at traffic stops.

Officer Tate testified that he prepared the arrest warrant. He said he told the judicial commissioner the Defendant swung a knife at Officer Sanson in the kitchen. He said that despite giving the commissioner a full description of the Defendant's arrest, the commissioner did not include a complete description of the events in the warrant. He said most warrants were very brief, not very descriptive, and "just enough to get the defendant into court."

On cross-examination, Officer Tate testified that he had worked in law enforcement for twenty-two years. He agreed that he received training in self-defense and in the use of weapons. He said that when he first encountered the Defendant, he did not know the Defendant had recently been shot with a taser. He disagreed the Defendant only retreated while in the front yard. He said the Defendant moved toward the officers shortly after leaving the home. He agreed he met with the judicial commissioner to prepare the arrest warrant shortly after driving the Defendant to jail. He agreed the warrant did not state that the Defendant swung a knife at Officer Sanson. He said that the commissioner instead described the incident as a "confrontation" and that this was not the first time a commissioner changed the description of an event in a warrant. He said he prepared the arrest report the day after the Defendant's arrest. He agreed the arrest report did not state that the Defendant stiff-armed Officer Sanson or that the Defendant threatened in the patrol car to kill Officer Sanson. He agreed these events were significant. He agreed that a full description of the Defendant's arrest was mentioned at the Defendant's preliminary hearing.

Officer Tate testified that he was afraid that the Defendant would stab him during the confrontation. He said he was more afraid of knives than guns. He agreed that the officers pointed their guns at the Defendant and that he and the other officers were larger than the Defendant. He denied that he used his gun regularly and said that he only removed his gun from its holster when he feared for his life or another citizen's life. He said the Defendant was highly intoxicated and did not appear to feel pain during the confrontation. He agreed he and the other officers feared the Defendant but denied he was angry with the Defendant.

On redirect examination, Officer Tate testified that his arrest report stated that the Defendant threatened Officer Sanson and Officer Gore with a knife in the kitchen and that the Defendant held the knife by the blade as if to throw it. He agreed that he encountered many intoxicated and belligerent people but said that none of those persons threatened his life. On re-cross examination, Officer Tate agreed that the arrest report did not state the Defendant swung the knife at Officer Sanson in the kitchen.

Jolene Crader testified that she lived at 703 Bragg Circle with the Defendant. She said that on the day of his arrest, the Defendant asked to borrow her car and that she refused because the Defendant was intoxicated. She said the Defendant had not consumed alcohol in years. She said the Defendant walked out of the house and bent the hood of her car. She said that the Defendant repaired the hood earlier in the week and that he told her, "I fixed it, now I'll unfix it." She said the Defendant also broke a door frame in the house. She said she called her younger son, Jason Crader, and told him what the Defendant did. She said she asked Mr. Crader to speak with the Defendant to calm him down. She said that Mr. Crader asked her if she wanted him to call the police and that he called the police after she told him to call. She said that the Defendant began to calm down and that he went to the driveway to

repair the hood of her car. She said the Defendant returned to the house and told her that the police had arrived and that she should see what they wanted. She said she walked out the front door and saw Officer Tate. She denied she told Officer Tate that she wanted to kill the Defendant, saying, "If I wanted him dead, I'd [have] done that myself." She said she did not know that Officer Gore and Officer Sanson walked to the back of her home. She said she spoke two or three words to Officer Tate before the Defendant came "busting out the door," followed by Officer Gore and Officer Sanson. She said that Jason Crader arrived shortly after the Defendant walked out of the house.

Ms. Crader testified that she did not see what happened in the house. She said that she saw most of the confrontation in the front yard but that she missed about a minute of it when she went into the house. She said that the officers pointed their guns at the Defendant and that the Defendant had a knife in his hand. She said he had the knife in his hand because he had been using it to fix the hood of her car. She said she did not see the Defendant swing the knife or advance on the officers. She said the Defendant retreated constantly. She said that the officers looked mad and that they did not appear to be scared. She said that the officers repeatedly told the Defendant to drop the knife and that they shot him twice with a taser. She said that the Defendant eventually tossed the knife to the ground and that the officers tackled him to the ground. She said the Defendant told the officers that he could not give them one arm because it was pinned underneath his body.

Ms. Crader testified that a few days after the arrest, she went with the Defendant to the police station to apologize to Officer Tate and Officer Sanson. She said Officer Sanson told the Defendant not to worry about it, that he understood, and that similar things happened all the time. She said the Defendant also apologized to Officer Gore, but she admitted she was not present for that apology. She agreed she filed a complaint against Officer Gore a few months before the Defendant's arrest. She agreed that she did not hear the testimony of the officers and that she had not rehearsed her testimony with anyone. She admitted she discussed the case with her family and with defense counsel.

On cross-examination, Ms. Crader agreed that she met with Officer Jason Kennedy about two weeks before trial and that they discussed the case. She admitted she told Officer Kennedy that the Defendant threatened to cut the officers' hearts out. She agreed she told Officer Kennedy that the Defendant could not "handle his whiskey" and that the Defendant became angry when he drank alcohol. She agreed that the Defendant was upset with her the day he was arrested and that he bent her car hood and broke a door frame. She said she never had called the police on the Defendant. She said Mr. Crader called the police because he knew she would not call them. She agreed she did not want the Defendant to get into trouble.

Ms. Crader agreed that she did not see what occurred in the kitchen. She said there were about ten or twelve feet between the Defendant and the officers in the front yard. She said the Defendant would take a step back each time the officers moved toward him. She said she did not see the Defendant swing the knife. She agreed she did not see the entire confrontation because she entered the house twice.

The Defendant did not testify. The jury found the Defendant guilty of three counts of aggravated assault, and he pled guilty to resisting arrest with a weapon. This appeal followed.

## I

The Defendant contends that the evidence was insufficient to support his convictions. He argues that the officers could not have feared him because they outnumbered him, were trained to handle intoxicated persons, and could have used deadly force to end the confrontation. The State contends that the evidence was sufficient to support the Defendant's convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

We note that despite pleading guilty to resisting arrest, the Defendant challenges the sufficiency of the evidence with regard to that conviction. Nothing in the record indicates that the Defendant's guilty plea was not knowingly and voluntarily entered. As a result, he has waived any challenge to the sufficiency of the evidence on appeal. See Hobbs v. State, 73 S.W.3d 155, 158-59 (Tenn. Crim. App. 2001) ("Absent some proof in the record that [the defendant's] guilty plea was not knowingly and voluntarily entered, the only conclusion to be reached is that he waived any challenge to the sufficiency of the evidence upon entry of the guilty plea.").

With regard to the Defendant's remaining convictions, a person commits assault who "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." T.C.A. § 39-13-101(a)(2) (2006) (amended 2009, 2010). A person commits aggravated

assault who "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [u]ses or displays a deadly weapon." T.C.A. § 39-13-102(a)(1)(B).

Taken in the light most favorable to the State, Officer Gore and Officer Sanson testified that the Defendant swung at Officer Sanson with a buck knife in the kitchen. The Defendant told the officers that he was going to cut off their heads and cut out their hearts, and asked them if they were ready to die. After being shot with a taser, the confrontation continued outside. The Defendant continued to verbally threaten the officers' lives and held his knife by the blade as if he were going to throw it at the officers. Each of the officers testified that he was afraid the Defendant would stab him.

We conclude that a rational trier of fact could have found the elements of aggravated assault beyond a reasonable doubt. We hold that the evidence is sufficient to support the Defendant's convictions.

**II**

The Defendant contends that his sentences are not consistent with the purposes and principles of the Sentencing Reform Act because the court failed to apply an applicable mitigating factor. He also contends that his sentences are excessive because he was presumptively entitled to the lowest sentences in the applicable range. The State contends that the trial court properly sentenced the Defendant after considering the purposes and principles of the Sentencing Reform Act. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d) (2006). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and

enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210. From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)).

At the sentencing hearing, Laura Prosser testified that she was a presentence investigator with the Tennessee Board of Probation and Parole and that she prepared the Defendant's presentence report. She said the Defendant had convictions spanning from 1984 to 2008. She said the Defendant was convicted of theft under 500 dollars, two counts of possessing schedule II hydromorphone, two counts of criminal impersonation, two counts

of possessing marijuana, vandalism over 500 dollars, possessing drug paraphernalia, possessing more than a half ounce of schedule VI drugs, two counts of driving with a revoked license, two counts of driving under the influence of an intoxicant, and of being a habitual traffic offender.

The State informed the trial court that the Defendant had additional convictions spanning from 1995 to 1997 that were not listed in the presentence report. The State submitted certified copies of the convictions, and the Defendant did not object. The State said the Defendant was convicted of disorderly conduct, two counts of driving under the influence of an intoxicant, two counts of driving with a revoked license, public intoxication, evading arrest, and of vandalism and destruction of property.

The Defendant testified that most of his criminal convictions were related to drugs and alcohol. He said he never physically hurt anyone. He said that he was addicted to alcohol and that this addiction led to his criminal offenses. He said he had not consumed alcohol for ten years, other than on the day of his arrest. He said he drank alcohol that day because he had been spending time with a woman who enjoyed drinking alcohol. He said that he was "clean" and that he would not have trouble staying away from drugs and alcohol if placed on probation. He said he maintained steady employment performing construction and installing cable television. He said he earned his GED while incarcerated. He said he helped take care of his mother and his daughter. He said he supported his daughter and spent time with her on weekends.

The Defendant testified that on the day of his arrest, he asked to borrow Ms. Crader's car in order to pick up his daughter. He said that he was drinking alcohol and that he was upset after Ms. Crader refused to loan him her car. He said he bent the hood of her car. He said Ms. Crader called his brother, who called the police. He said that when the police arrived, his argument with Ms. Crader was over and that he was using a knife to repair the latch on the hood of her car. He said that he went into the house to tell Ms. Crader about the police and that she told him she would "take care of it." He said that as he watched his mother speak with Officer Tate in the front yard, two officers entered the kitchen and shot him with a taser. He said that he did not see the officers before they "electrocuted" him and that he ran out of the house to get away from them. He said that although he had a knife in his hand, he did not "pull" the knife on the officers and that he never intended to scare them. He said he did not hear anything the officers said until they stopped shooting him with tasers and asked him to drop the knife. He said that his mind was "scrambled" from the tasers and that he did not realize he still had the knife in his hand. He said he dropped the knife when asked to do so. He said he did not threaten to kill the officers.

The Defendant testified that he accepted responsibility for his actions. He admitted he had five prior felony convictions. He admitted that he violated former conditions of parole and probation that resulted in revocation. He agreed he was released from jail a year and three months before his arrest. He admitted he was convicted of theft while this trial was pending.

Ms. Crader testified that the Defendant lived with her and helped her around the house. She agreed that the Defendant had many criminal convictions but said that his actions harmed no one but himself. She attributed his convictions to alcohol and drug use and said she did not allow alcohol in her home. She said the Defendant was avoiding alcohol. She agreed the Defendant was drinking alcohol shortly before his arrest. She said that they began arguing when she refused to give him her car keys and that their argument was over before the police arrived. She said her son, Jason Crader, called the police after speaking with her. She said she attempted to call Mr. Crader a second time to ask him not to involve the police but was too late. She said she tried to send the officers away but was unable to because they came into her home "like the Gestapo." She said the Defendant was the only person assaulted on the day of his arrest. Ms. Crader said the Defendant was not a danger to anyone. She said that if he were placed on probation, she would do her best to make him behave.

On cross-examination, Ms. Crader agreed that the police are supposed to serve and protect people. She disagreed that she needed protection from her son on the day of his arrest.

Hazel Richards testified that she was the Defendant's grandmother. She agreed that she was not present when the Defendant was arrested. She said that alcohol caused most of the Defendant's problems and that she would help the Defendant behave if he were placed on probation.

The trial court found that the following enhancement factors applied pursuant to Tennessee Code Annotated section 40-35-114:

> (1) the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;
>
> (8) the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community;

(19) the victims of the aggravated assault were law enforcement officers performing official duties and the Defendant knew or should have known that the victims were law enforcement officers.

See T.C.A. § 40-35-114 (2010). The trial court found that no mitigating factors applied to the Defendant's aggravated assault convictions. The court found that mitigating factor (13), the Defendant accepted responsibility for his actions, applied to his conviction for resisting arrest. See T.C.A. § 40-35-113 (2010). The trial court denied alternative sentencing and found that the Defendant had "a history of failure to abide by the terms . . . of release into the community. Measures less restrictive than confinement have both frequently and recently been applied unsuccessfully to [the Defendant]." He was sentenced as a Range II, multiple offender to eight and one-half years' confinement for each of the aggravated assault convictions and to eleven months, twenty-nine days' confinement for the resisting arrest conviction, to be served concurrently.

The Defendant contends that his sentences are not consistent with the purposes and principles of the Sentencing Reform Act because the trial court failed to apply an applicable mitigating factor. The Defendant argues that mitigating factor (11) should apply because he was intoxicated, retreated from police at "every instance," and was the only person who was injured during the confrontation. See T.C.A. § 40-35-113(11) ("The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct."). We disagree. The record does not reflect that these offenses were committed under unusual circumstances. It instead shows that the Defendant swung a knife at Officer Sanson in the home and that he continued to threaten three uniformed police officers during a prolonged confrontation in the front yard. Although the Defendant claimed he had not consumed alcohol in years, other than on the day of his arrest, he admitted that he had a long history of criminal convictions resulting from voluntary intoxication. We conclude that the record does not support the application of mitigating factor (11).

The Defendant also contends that his sentences are excessive because he was presumptively entitled to the lowest sentences in the range. The Defendant's argument is misplaced. The trial court was required to consider, but was not bound by, the advisory sentencing guideline stating, "The minimum sentence within the range of punishment is the sentence that should be imposed." After considering this advisory guideline, the trial court had the discretion to impose sentences within the applicable range that were consistent with the purposes and principles of the Sentencing Act. The record reflects that the trial court imposed lawful sentences within the applicable range after considering the sentencing

-14-

principles and all relevant facts and circumstances.  The Defendant is not entitled to relief on this issue.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE